GREGORY E. ROBINSON, CA State Bar No. 109693
ger@rrlawyers.com
JEFFREY A. ROBINSON, CA State Bar No. 132262
jar@rrlawyers.com
ROBINSON & ROBINSON, LLP
2301 Dupont Drive, Suite 530
Irvine, California 92612
Telephone:  (949) 752-7007
Facsimile:  (949) 752-7023
Attorneys for Defendant, Counter-
Claimant and Third-Party Plaintiff
Honeyville, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LA AMAPOLA, INC., a California Corporation,<br>　　　　　Plaintiff,<br>　　v.<br><br>HONEYVILLE, INC, a corporation doing business in California, and DOES 1 thru 100,<br>　　　　　Defendants.<br>_____<br>HONEYVILLE, INC, a corporation<br>　　　　　Counter-Claimant,<br>　　v.<br>LA AMAPOLA, INC., a California Corporation,<br>　　　　　Counter-Defendant,<br>_____<br>AND THIRD-PARTY CLAIM<br>_____ | Case No.  2:17-cv-01946 AB (ASx)<br>Assigned to: Hon. André Birotte, Jr.<br><br>**HONEYVILLE, INC.'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT**<br><br><br>Final Pretrial Conference<br>Date: October 05, 2018<br>Time: 11:00 a.m.<br>Department: 7B<br><br>Trial<br>Date: October 30, 2018<br>Time: 8:30 a.m.<br>Department: 7B |

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

**HONEYVILLE'S
MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

Defendant and Cross-Complainant Honeyville, Inc. ("Honeyville" or "Defendant") submits the following draft Memorandum of Contentions of Law and Fact. Honeyville reserves the right to modify the matters set forth herein, within the confines of the court rules and applicable law.

## I.   SUMMARY OF THE CLAIMS HONEYVILLE HAS PLEADED AND INTENDS TO PURSUE

Defendant and Cross-Complainant Honeyville denies liability to Plaintiff La Amapola, Inc. ("La Amapola") on La Amapola's Complaint and asserts that Third-Party Defendant Gavilon Grain, LLC is liable to pay Honeyville for any and all amounts that La Amapola establishes are due from Honeyville on the La Amapola Complaint and the Honeyville Third Party Complaint.

Honeyville alleges that any problems experienced by La Amapola alleged in their complaint were caused exclusively by Gavilon, and/or La Amapola, not Honeyville.

### A.   <u>Summary Statement of Honeyville's Defenses To La Amapola's Complaint</u>

1. <u>General Defense</u>: Honeyville denies that facts establish La Amapola's Claims.

   Honeyville neither accepts nor rejects La Amapola's assertion that La Amapola's actions did not cause or contribute to its damages. La Amapola is required to prove up its case to a jury. To the extent there was an issue with the white corn, La Amapola's actions may have worsened the problem

2. <u>Affirmative Defense: Failure to Exercise Appropriate Care</u>: La Amapola Failed to Exercise Appropriate Care in the Processing of the White Corn into Masa.

3. <u>Affirmative Defense: Non-Actionable Statements</u>.   Alleged misstatements did not rise to the level of actionable

1

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

misrepresentations.  Honeyville had a reasonable basis to make any quality-related statements, and was not negligent in doing so.

4. <u>Affirmative Defense: Non-Reliance</u>.  Defendant did not rely on statements, or the nature of the statements was such that "representations" could not be relied upon.

5. <u>Offset for Unpaid Invoice</u>:  Any alleged damages against Honeyville must be reduced by the amount of the Honeyville invoice that La Amapola failed to pay.

**B.** **Summary Statement of Honeyville's Claims Against Gavilon**

Honeyville's Cross-Complaint alleges that any problems suffered by La Amapola, if not the result of La Amapola's actions, are the result of defective corn supplied by Gavilon.

1. <u>First Claim: Implied Contractual Indemnity</u>
2. <u>Second Claim: Implied Warranty of Merchantability</u>
3. <u>Third Claim: Implied Warranty Of Fitness For A Particular Purpose</u>
4. <u>Fourth Claim: Breach of Express Warranties</u>
5. <u>Fifth Claim: Breach of Written Contract</u>

**II.** **ELEMENTS REQUIRED TO ESTABLISH HONEYVILLE'S CLAIMS AND DEFENSES**

**A.** **Elements of Honeyville's Affirmative Defenses To La Amapola's Claims**

**1.** **General Defense: Honeyville denies that facts establish La Amapola's Claims**

a. <u>Legal Elements</u>

i. La Amapola bears the burden of proof on its claims.

ii. Source: Cal. Evid. Code § 500.

b. <u>Factual Evidence Relied Upon: Partial Summary Thereof</u>

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

2

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

i.  La Amapola representatives will testify that the company did not have complete written protocols and procedures; that it relied upon temporary workers at the time of the incident; that it did not maintain production records for different batches.  Honeyville's expert will testify that La Amapola's Los Angeles locations were not maintained in a thoroughly sanitary fashion; that La Amapola had no visible signs of a quality control system meeting standards of "Good Manufacturing Practiced Regulations" or "Food Safety and Modernization Act."

ii.  Problems experienced by La Amapola were more severe than those experienced by other Honeyville customers, indicating that La Amapola's own actions or omissions caused or contributed to the tamale failures.

iii.  Such factors may have caused or contributed to the incident, and were outside the control of Honeyville.

iv.  Further, with respect to the claim for negligent misrepresentation, one La Amapola must establish that Honeyville had no reasonable grounds for believing the representation was true at the time it was made.  (CACI 1903, Element 3). The alleged misrepresentations were generalized statements about the high quality of the corn. There are many facts that support the reasonability of these statements, including the contract specifications required by Honeyville, and the USDA No. 1 and "Enogen negative" documentation furnished by by Gavilon.

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

**2.** **Affirmative Defense: Failure to Exercise Appropriate Care**

Although Honeyville pleaded this as an affirmative defense, it is more properly characterized as an element of La Amapola's claim upon which La Amapola bears the burden of proof.

a.   Legal Elements

   i.   Causation is an element of each of La Amapola's claims (for breach of warranty, and for negligent misrepresentation).

   ii.   Source: California Civil Jury Instructions (CACI) No. 303 (element 6)—Breach of Contract; CACI No. 1231 (element 6)—Implied Warranty of Merchantability; CACI No. 1232 (element 8)—Implied Warranty of Fitness for a Particular Purpose.

b.   Factual Evidence Relied Upon: Partial Summary Thereof

   i.   La Amapola Failed to Exercise Appropriate Care in the Processing of the White Corn into Masa. La Amapola representatives will testify that the company did not have complete written protocols and procedures; that it relied upon temporary workers at the time of the incident; that it did not maintain production records for different batches. Honeyville's expert will testify that La Amapola's Downey and Los Angeles locations were not maintained in a thoroughly clean and sanitary fashion.

   ii.   Such factors may have caused or contributed to the incident, and were outside the control of Honeyville.

**3.** **Affirmative Defense: Non-Actionable Statements**

Although Honeyville pleaded this as an affirmative defense, it is

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

more properly characterized as an element of La Amapola's claim upon which La Amapola bears the burden of proof.

With respect to allegations of misrepresentation, the alleged statements do not rise to the level of actionable "representations."

a. <u>Legal Elements</u>

    i. As part of its claim for negligent misrepresentation, La Amapola must establish that Honeyville made misrepresentations of <u>fact</u>.

    ii. Source: California Civil Jury Instructions (CACI) No. 1903, and authorities cited in notes "Directions for Use" and Sources and Authority. (*See Hauter v. Zogarts* (1975) 14 Cal.3d 104, 111-113; *see also Haserot v. Keller* (1924) 67 Cal.App 659, 670; *see also Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1469.)

b. <u>Factual Evidence Relied Upon: Partial Summary Thereof</u>

    i. Many if not all of the alleged negligent misrepresentation made (e.g., that the product was of the "highest quality") were not actionable facts, but mere opinion and sales puffery. Com. C. § 2313(2)

**4.** **<u>Affirmative Defense: Non-Reliance</u>**

Although Honeyville pleaded this as an affirmative defense, it is more properly characterized as an element of La Amapola's claim upon which La Amapola bears the burden of proof.   Defendant did not rely on statements, or the nature of the statements was such that "representations" could not be relied upon.

a. <u>Legal Elements</u>

    i. La Amapola has the burden of establishing that it reasonably relied upon the alleged representation.

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

ii. Source: California Civil Jury Instructions (CACI) No. 1903 (element 5).

b. Factual Evidence Relied Upon: Partial Summary Thereof

i. Many if not all of the alleged negligent misrepresentation made (e.g., that the product was of the "highest quality") were not actionable facts, but mere sales puffery. Com. C. § 2313(2)

**5.** **Affirmative Defense: Offset for Unpaid Invoice**

Although Honeyville pleaded this as an affirmative defense, it is more properly characterized as an element of La Amapola's claim upon which La Amapola bears the burden of proof. Any alleged damages against Honeyville must be reduced by the amount of the Honeyville invoice that La Amapola failed to pay—to put the parties in the same position they would have been in if they had both complied with the contract.

a. Legal Elements

i. La Amapola has the burden of establishing that it complied with all of its obligations to establish any contract-based claim.

ii. Source: California Civil Jury Instructions (CACI) No. 303—Breach of Contract—Essential Factual Elements (element 2).

b. Factual Evidence Relied Upon: Partial Summary Thereof

i. La Amapola did not pay for the white corn it purchased from Honeyville. Honeyville executives will testify, and Honeyville's records show, that La Amapola owes Honeyville $126,277 for white corn it purchased and received.

6

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

ii.   Any damages that it claims due to receiving allegedly defective product must be reduced by the amount which La Amapola owes Honeyville on the unpaid invoices. (*See* <u>Cal. Code Civ. Proc.</u> 431.70; *See Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 198.)

## B.   Elements of Honeyville's Claims Against Gavilon

### 1.   First Claim: Implied Contractual Indemnity

a.   <u>Legal Elements</u>

i.   Gavilon failed to comply with its contract obligations to Honeyville when selling white corn.

ii.   Gavilon's failure to comply with its contract obligations was a substantial factor in causing Honeyville's harm.

iii.   Source: California Civil Jury Instructions ("CACI") No. 3801.

b.   <u>Factual Evidence Relied Upon; Partial Summary Thereof:</u>

i.   Regarding the first element above [contract and breach], the evidence to be supplied in connection with the 5th Claim (Breach of Contract) 4th claim ((Breach of Express Warranty), 3rd Claim (Breach of Implied Warranty of Fitness for a Particular Purpose) and 2nd Claim (Implied Warranty of Merchantability) will establish the first element: the existence of a contract between Gavilon and Honeyville; and Gavilon's breach of its contract obligations.

ii.   In summary, this will include the following: (A) Honeyville and Gavilon entered into a written contract for the sale of white corn by Gavilon to Honeyville; (B)

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

under the terms of the contract, the white corn was to be free from Enogen; (C) Gavilon made express warranties, including but not limited to express warranties that the white corn would not contain Enogen; and that the white corn would perform properly when steeped in lime water (nixtamalization), ground and processed (the process used for making tamales); (D) Gavilon impliedly warranted that the white corn would be fit for its ordinary purposes, which included making tamales; (E) Gavilon impliedly warranted that the white corn would be merchantable, which meant that the corn would perform well when used for ordinary purposes, which includes tamales, and would not contain Enogen (which is used for making ethanol, not food).

iii.  In addition, this evidence (described in more detail below) will establish that the white corn Gavilon sold to Honeyville breached these contract obligations, because, among other things: (A) the white corn contained Enogen; (B) the white corn did not perform properly when nixtamalized and processed and ground into masa for making tamales; (C) the white corn was not suitable for making tamales.

iv.  Regarding the second element (substantial harm caused to Honeyville), the evidence to be adduced in connection with the following claims (described in more detail below) will show that (A) as a result of the white corn containing Enogen, it failed to make proper tamales, (B) even if failure was not due to Enogen, it failed to perform

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

properly when making tamales due to defects in the corn as indicated by La Amapola's expert Dr. Murray; (C) as a direct result, Honeyville's customers where harmed due to lost business and lost customers; Honeyville's customers, including La Amapola and multiple others, stopped doing business with Honeyville, causing significant damages.

2. **Second Claim: Breach of Implied Warranty of Merchantability**

    a.   <u>Legal Elements</u>

       i.   Honeyville bought white corn from Gavilon.

      ii.   At the time of the purchase, Gavilon was in the business of selling white corn.

     iii.   The white corn Gavilon sold to Honeyville was one or more of the following: (A) not of the same quality as white corn generally accepted in the trade (i.e., would not pass without objection in the trade under the contract description); or (B) not fit for the ordinary purposes for which white corn is used; or (C) not fair or average quality white corn; or (D) not of even kind and quality within the variations permitted in the agreement.

     iv.   Honeyville took reasonable steps to notify Gavilon within a reasonable time of the white corn problems.

      v.   Honeyville was harmed.

     vi.   The failure of the white corn to have the expected quality was a substantial factor in causing Honeyville's harm.

    vii.   Source: California Civil Jury Instructions ("CACI") No. 1231; California Uniform Commercial Code 2314.

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

b.   Factual Evidence Relied Upon; Partial Summary Thereof:

   i.   At the time of the purchase, Gavilon was in the business of selling white corn.

   ii.   The white corn Gavilon sold to Honeyville was one or more of the following: (A) not of the same quality as white corn generally accepted in the trade (would not pass without objection in the trade under the contract description); or (B) not fit for the ordinary purposes for which white corn is used; or (C) not fair or average quality white corn; or (D) not of even kind and quality within the variations permitted in the agreement.

   iii.   Honeyville took reasonable steps to notify Gavilon within a reasonable time that the white corn had these problems.

   iv.   Honeyville was harmed.

   v.   The failure of the white corn to have the expected quality was a substantial factor in causing Honeyville's harm.

   vi.   Source: California Civil Jury Instructions ("CACI") No. 1231; California Uniform Commercial Code 2314.

**3.   Third Claim: Breach of Implied Warranty Of Fitness For A Particular Purpose**

a.   Legal Elements

   i.   Honeyville bought white corn from Gavilon.

   ii.   At the time of purchase, Gavilon knew or had reason to know that Honeyville intended to use the product for a particular purpose.

   iii.   At the time of purchase, Gavilon knew or had reason to know that Honeyville was relying on Gavilon's skill and

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

judgment to furnish a product that was suitable for the particular purpose.

 iv. Honeyville justifiably relied on Gavilon's skill and judgment.

 v. The white corn sold by Gavilon was not suitable for the particular purpose.

 vi. Honeyville took reasonable steps to notify Gavilon within a reasonable time that the product was not suitable.

 vii. Honeyville was harmed.

 viii. The failure of the white corn to be suitable was a substantial factor in causing Honeyville's harm.

 ix. Source: California Civil Jury Instructions ("CACI") No. 1232; California Uniform Commercial Code 2315.

 b. <u>Factual Evidence Relied Upon—Partial Summary Thereof</u>

 i. Purchase of corn: (A) it is undisputed that Gavilon sold white corn to Honeyville, and that Gavilon was a merchant with respect to such corn.

 ii. Gavilon knew or had reason to know that Honeyville intended to use the product for a particular purpose. Factual evidence includes: (A) Commencing on or around November 30, 2016, certain Honeyville representatives were in contact with Gavilon representatives by phone and email regarding the potential of purchasing white corn from Gavilon; (B) in one conversation Honeyville's president Ed Hemphill informed Gavilon' representative Dale Brockemeier that Gavilon wanted to purchase white corn for use in the

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

Hispanic market segment (tortillas, tamales, chips), and did not want any Enogen corn (used for Ethanol plants); Brockemeier agreed to supply white corn meeting these needs; (C) Gavilon knew that Honeyville was purchasing the white corn for resale to Honeyville's customers for use in producing human food products ordinarily utilizing white corn as an ingredients, such as for tamales; Gavilon knew that white corn was used for making masa and tamales in the Southern California Hispanic food market; Gavilon knew that Honeyville was not purchasing the corn for ethanol production; (D) On Friday, December 2, 2016 three Honeyville representatives met with a Gavilon representative – specifically Dale Brockemeier, to discuss the possibility of Honeyville's purchase of white corn. At this meeting that Mr. Brockemeier delivered to Honeyville the Gavilon Grain Inc. White Corn Terms" sheet (the "Gavilon White Corn Specification Sheet"). This document was represented as setting out the specifications that Gavilon required of its sources and what Honeyville could expect from white corn purchased from Gavilon. This document listed the following as part of Gavilon's white corn "Food Grade Quality Specifications": "Enogen Negative" and "Purple/Dark Kernels ZERO allowed." On or about December 2, 2016, Samuel Evans at Honeyville transmitted Honeyville's white corn specification sheet to Gavilon ("Honeyville Specification Sheet"). The Honeyville Specification Sheet stated that the corn was needed for human food purposes, and needed to perform

12

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

properly when steeped in lime water (nixtamalization), ground and processed. Gavilon approved Honeyville's Specification Sheet and expressed no concern about meeting the specifications on the sheet, except for the stress crack level. (E) Shortly after the December 2, 2016 meeting, Gavilon transmitted the Gavilon White Corn specification sheet to Honeyville via email. (F) Gavilon took these actions in order to induce Honeyville to purchase white corn from Gavilon, and Honeyville relied on Gavilon's actions.   (G) On December 5, 2016, a Gavilon internal email confirmed that the parties had reached an agreement for the sale of white corn; (H) On December 7, 2016, Mr. Brockemeier emailed to Sam Evans an "updated contract" with a handwritten notation regarding the "overrun bushels" that had been loaded. This document changed the quantity from 105,000 bushels to 107,655.89 bushels, which was the amount apparently loaded. This document was signed by Mr. Brockemeier. This email also transmitted the train car weights and grades sheet (the "Grade Sheet) and a "bill of lading." (I) Confirming the parties' earlier discussions and the Gavilon White Corn Specification Sheet, the Grade Sheet described the each rail car of white corn as being negative for Enogen. (J) Gavilon took these further actions in order to induce Honeyville to purchase white corn from Gavilon, and Honeyville relied on Gavilon's actions. (K) Upon receipt of the December 7 email and documentation, Sam Evans, located in Rancho Cucamonga, CA, emailed

13

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

contract paperwork to Wayne Watkins, who was then Honeyville's Executive Vice President located in Honeyville's headquarters, in Brigham City, UT. Mr. Watkins reviewed the paperwork and signed what had been presented to Honeyville as the updated contract. This included the one page "contract" and the Weights/Grade Sheet, relying on the white corn having the characteristics described in the Grade Sheet. (L)  These were the two pages comprising the attachment returned to Gavilon by Eric Chan, Honeyville's purchasing manager, via email on December 7, 2017.

iii. Gavilon knew or had reason to know that Honeyville was relying on Gavilon's skill and judgment to furnish a product that was suitable for the particular purpose: See supporting facts described above, including: (A) Honeyville and Gavilon had conversations in which Honeyville explained what it wanted, including white corn that did not contain Enogen; Honeyville sent Gavilon a written specification sheet of the characteristics which the white corn needed to meet, which included the fact that the white corn had to perform well in the nixtamalization process (used in making tamales), among other things; (C) Gavilon knew that Honeyville was not present when Gavilon selected, evaluated and tested the white corn it sent to Honeyville.

iv. Honeyville justifiably relied on Gavilon's skill and judgement. See supporting facts described above, including but not limited to: (A) Honeyville and Gavilon

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

had conversations in which Honeyville explained what it wanted, and Gavilon said it could supply conforming product; (B) Honeyville sent Gavilon a written specification sheet of the characteristics which the white corn needed to meet, which included the fact that the white corn had to perform well in the nixtamalization process (used in making tamales), among other things, and Gavilon expressed that it saw no issues with these requirements; (C) Gavilon knew that Honeyville was not present when Gavilon selected, evaluated and tested the white corn it sent to Honeyville. (D) Gavilon tested the white corn and represented that each railcar load of corn delivered was "negative" for the presence of Enogen; (E) Gavilon provided this written confirmation of negative Enogen to Honeyville for it to rely upon when signing the corn purchase contract.

v.  The white corn sold by Gavilon was not suitable for the particular purpose. (A) The white corn was used to make masa for tamales; tamales made from the corn would not cook properly; they did not form up; regardless of how long they were cooked up, ruining the tamale meals; (B) After the incident, Gavilon's white corn was tested and found to be contaminated with Enogen; (C) Experts, including Honeyville's experts Dr. Wayne Moore, Ph.D., and Dr. Joseph Awika, Ph.D., and La Amapola's expert Dr. Murray, analyzed the corn and concluded that defects in the white corn (either Enogen, in the case of Dr. Moore and Dr. Awika; or poorly formed starch, Dr.

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

Murray), caused the tamale problem; (E) Honeyville's representatives will testify that Honeyville's processing of the white corn did not change or alter the characteristics of the corn;  (F) executives of Gavilon, La Amapola, and Honeyville will testify that, white corn caused the problem, since there was no other reasonable explanation, due to multiple factors, including (G) The timing of the tamale problems: (I) they began and ended with Gavilon's corn; (II) The nature of the problems: starch failure in corn; (III) the undisputed fact that Enogen is designed to degrade corn starch; (IV) testing demonstrates that Gavilon's corn was actually contaminated by Enogen; (V) Gavilon had concerns about Enogen contaminating its corn, prior to this incident; (VI) Gavilon experienced similar problems experienced with other customers; (VII) Gavilon admitted to a different customer that it thought Enogen was causing similar problems; (VIII) Gavilon's own expert cannot rule out Enogen as the cause of the problems; (IX) executives of La Amapola and/or The Grayn Co. will testify that La Amapola's tamale problems continue after it stopped buying corn from Honeyville, because its replacement supplier The Grayn Co. was obtaining and selling to La Amapola Gavilon corn also; and (X) there is no evidence that Honeyville caused La Amapola's problems.

    vi.    Honeyville took reasonable steps to notify Gavilon within a reasonable time that the product was not

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

suitable: (A) Honeyville testimony and documents (texts, emails) show that Honeyville notified Gavilon immediately or very soon after it became aware of La Amapola's complaints about the white corn.

vii.   Honeyville was harmed. (A) Honeyville representatives will testify that La Amapola and at least five other customers quit purchasing white corn from Honeyville immediately after the incident. (B) Honeyville's executives and its forensic expert will testify that the resulting damages exceed $1.6 million.

viii.   The failure of the white corn to be suitable was a substantial factor in causing Honeyville's harm: (A) see evidence summarized at (v) above; (B) Honeyville had long-term relationships with most of its customers, including La Amapola. (C) Due to the incident these customers stopped buying white corn from Honeyville. (D) Honeyville's executives and its forensic expert will testify that the resulting damages exceed $1.6 million.

**4.**   **Fourth Claim: Breach of Express Warranties**

a.   Legal Elements

i.   Gavilon gave to Honeyville one or more of the following:

A.   A written warranty that: (I) the product sold was white corn; (II) that the white corn Gavilon sold to Honeyville would not contain Enogen; and (III) the white corn would perform properly when steeped in lime water (nixtamalization), ground and processed.

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

**B.** A statement that: (I) the product sold was white corn; (II) that the white corn Gavilon sold to Honeyville would not contain Enogen; and/or (III) the white corn would perform properly when steeped in lime water (nixtamalization), ground and processed.

**C.** A description: (I) the product sold was white corn; (II) that the white corn Gavilon sold to Honeyville would not contain Enogen; and/or (III) the white corn would perform properly when steeped in lime water (nixtamalization), ground and processed.

**D.** A sample of the white corn that did not contain Enogen.

ii. The white corn sold by Gavilon to Honeyville did not meet the product warranty.

iii. Honeyville took reasonable steps to notify Gavilon within a reasonable time that the product was not suitable.

iv. Honeyville was harmed.

v. The failure of the white corn to conform to the warranty was a substantial factor in causing Honeyville's harm.

vi. Source: California Civil Jury Instructions ("CACI") No. 1230; California Uniform Commercial Code 2313.

b. Factual Evidence Relied Upon; Partial Summary Thereof:

i. Gavilon gave to Honeyville one or more of the following:

A. Written warranty: (I) Prior to or in connection with the signing of the contract, Gavilon's representatives provided Honeyville with a written White Corn

18

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

Specification Sheet which indicated that its corn was white corn, was "Enogen Negative," with "ZERO purple/dark kernels" (a marker for Enogen"); and a Grade Sheet which stated that the white corn was "Enogen Negative," meaning that the white corn was not contaminated with Enogen. (II) In connection with a the contract, Gavilon's representatives reviewed Honeyville's White Corn Specification sheet, which stated that was to perform properly when steeped in lime water (nixtamalization), ground and processed (the process used for making tamale masa), and stated in an email that Honeyville's specifications were not a problem.

B.  A statement that the white corn Gavilon sold to Honeyville would not contain Enogen. (I) In late November and/or early December 2016 in response to a verbal request from Honeyville's president Ed Hemphill that Honeyville wanted to purchase white corn not containing Enogen, Gavilon's representatives Dale Brockemeier and/or Carson Watt verbally indicated to Mr. Hemphill and other representatives of Honeyville's sales team that the white corn would be Enogen free.

C.  A description: (I) Prior to or in connection with the signing of the contract, Gavilon's representatives provided Honeyville with a written White Corn Specification Sheet which indicated that its corn was white corn, was "Enogen Negative," with "ZERO

19

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

purple/dark kernels" (a marker for Enogen"); and a Grade Sheet which stated that the white corn was "Enogen Negative," meaning that the white corn was not contaminated with Enogen. (II) In connection with a the contract, Gavilon's representatives reviewed Honeyville's White Corn Specification sheet, which stated that was to perform properly when steeped in lime water (nixtamalization), ground and processed (the process used for making tamale masa), and stated in an email that Honeyville's specifications were not a problem.

D. A sample:   Prior to the sale, Gavilon provided a physical sample of white corn which did not contain colored kernels, including or purple kernels (a marker for Enogen).

ii.   The white corn sold by Gavilon to Honeyville did not meet the product warranty: (A) The white corn was used to make masa for tamales; tamales made from the corn would not cook properly; they did not form up; regardless of how long they were cooked up, ruining the tamale meals; (B) After the incident Gavilon's white corn was tested and found to be contaminated with Enogen; (C) Experts, including Honeyville's experts Dr. Wayne Moore, Ph.D., and Dr. Joseph Awika, Ph.D., and La Amapola's expert Dr.  Murray, analyzed the corn and concluded  that defects in the white corn (either Enogen, in the case of Dr. Moore  and Dr. Awika; or poorly formed starch, Dr. Murray), caused the tamale problem;

20

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

(E) Honeyville's representatives will testify that Honeyville's processing of the white corn did not change or alter the characteristics of the corn;  (F) executives of Gavilon, La Amapola, and Honeyville will testify that, white corn caused the problem, since there was no other reasonable explanation, due to multiple factors, including (G) The timing of the tamale problems: (I) they began and ended with Gavilon's corn; (II) The nature of the problems: starch failure in corn; (III) the undisputed fact that Enogen is designed to degrade corn starch; (IV) testing demonstrates that Gavilon's corn was actually contaminated by Enogen; (V) Gavilon had concerns about Enogen contaminating its corn, prior to this incident; (VI) Gavilon experienced similar problems experienced with other customers; (VII) Gavilon admitted to a different customer that it thought Enogen was causing similar problems; (VIII) Gavilon's own expert cannot rule out Enogen as the cause of the problems; (IX) executives of La Amapola and/or The Grayn Co. will testify that La Amapola's tamale problems continue after it stopped buying corn from Honeyville, because its replacement supplier The Grayn Co. was obtaining and selling to La Amapola Gavilon corn also; and (X) there is no evidence that Honeyville caused La Amapola's problems.

iii.    Honeyville took reasonable steps to notify Gavilon: Honeyville testimony and documents (texts, emails) show that Honeyville notified Gavilon immediately or very soon after it became aware of La Amapola's

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

complaints about the white corn.

    iv.    Honeyville was harmed.  (A) Honeyville representatives will testify that La Amapola and at least five other customers quit purchasing white corn from Honeyville immediately after the incident. (B) Honeyville's executives and its forensic expert will testify that the resulting damages exceed $1.6 million.

    v.    The failure of the white corn to conform to the warranty was a substantial factor in causing Honeyville's harm: (A) see evidence summarized at (ii) above;  (B) Honeyville had long-term relationships with most of its customers, including La Amapola. (C) Due to the incident these customers stopped buying white corn from Honeyville. (D) Honeyville's executives and its forensic expert will testify that the resulting damages exceed $1.6 million.

## 5. Fifth Claim: Breach of Written Contract

    a.    Legal Elements

        i.    Honeyville and Gavilon entered into a contract.

        ii.    Honeyville did all, or substantially all, of the significant things what the contract required Honeyville to do.

        iii.    Gavilon failed to do something that the contract required.

        iv.    Honeyville was harmed.

        v.    Gavilon's breach of contract was a substantial factor in causing Honeyville's harm.

        vi.    Source: California Civil Jury Instructions ("CACI") No. 303.

    b.    Factual Evidence Relied Upon; Partial Summary Thereof:

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

i.   Honeyville and Gavilon entered into a contract.   (A) Commencing on or around November 30, 2016, certain Honeyville representatives were in contact with Gavilon representatives by phone and email regarding the potential of purchasing white corn from Gavilon; (B) in one conversation Honeyville's president Ed Hemphill informed Gavilon's representative Dale Brockemeier that Gavilon wanted to purchase white corn for use in the Hispanic market segment (tortillas, tamales, chips), and did not want any Enogen corn (used for Ethanol plants); Brockemeier agreed to supply white corn meeting these needs; (C) Gavilon knew that Honeyville was purchasing the white corn for resale to Honeyville's customers for use in producing human food products ordinarily utilizing white corn as an ingredients, such as for tamales; Gavilon knew that white corn was used for making masa and tamales in the Southern California Hispanic food market; Gavilon knew that Honeyville was not  purchasing the corn for ethanol production; (D) On Friday, December 2, 2016 three Honeyville representatives met with a Gavilon representative – specifically Dale Brockemeier, to discuss the possibility of Honeyville's purchase of white corn.  At this meeting that Mr. Brockemeier delivered to Honeyville the Gavilon Grain Inc. "White Corn Terms" sheet (the "Gavilon White Corn Specification Sheet").  This document was represented as setting out the specifications that Gavilon required of its sources and what Honeyville could expect from white corn purchased from Gavilon.

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

This document listed the following as part of Gavilon's white corn "Food Grade Quality Specifications": "Enogen Negative" and "Purple/Dark Kernels ZERO allowed." On or about December 2, 2016, Samuel Evans at Honeyville transmitted Honeyville's white corn specification sheet to Gavilon ("Honeyville Specification Sheet"). The Honeyville Specification Sheet stated that the corn was needed for human food purposes, and needed to perform properly when steeped in lime water (nixtamalization), ground and processed. Gavilon approved Honeyville's Specification Sheet and expressed no concern about meeting the specifications on the sheet, except for the stress crack level. (E) Shortly after the December 2, 2016 meeting, Gavilon transmitted the Gavilon White Corn specification sheet to Honeyville via email. (F) Gavilon took these actions in order to induce Honeyville to purchase white corn from Gavilon, and Honeyville relied on Gavilon's actions. (G) On December 5, 2016, a Gavilon internal email confirmed that the parties had reached an agreement for the sale of white corn; (H) On December 7, 2016, Mr. Brockmeier emailed to Sam Evans an "updated contract" with a handwritten notation regarding the "overrun bushels" that had been loaded.  This document changed the quantity from 105,000 bushels to 107,655.89 bushels, which was the amount apparently loaded. This document was signed by Mr. Brockemeier.  This email also transmitted the train car weights and grades sheet (the "Grade Sheet) and a "bill of lading." (I) Confirming the

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

parties' earlier discussions and the  Gavilon White Corn Specification Sheet, the Grade Sheet described the each rail car of white corn as being negative for Enogen. (J) Gavilon took these further actions in order to induce Honeyville to purchase white corn from Gavilon, and Honeyville relied on Gavilon's actions. (K) Upon receipt of the December 7 email and documentation, Sam Evans, located in Rancho Cucamonga, CA, emailed contract paperwork to Wayne Watkins, who was then Honeyville's Executive Vice President located in Honeyville's headquarters, in Brigham City, UT.  Mr. Watkins reviewed the paperwork and signed what had been presented to Honeyville as the updated contract. This included the one page "contract" and the Weights/Grade Sheet, relying on the white corn having the characteristics described in the Grade Sheet. (L)  These were the two pages comprising the attachment returned to Gavilon by Eric Chan, Honeyville's purchasing manager, via email on December 7, 2016.

ii.  Honeyville did all, or substantially all, of the significant things what the contract required Honeyville to do. Honeyville paid in full Gavilon's invoice for the white corn in the amount of 547,361.78.

iii.  Gavilon failed to do something that the contract required. The product sold by Gavilon was not merely white corn; it also contained Enogen. Gavilon failed to provide white corn that was not contaminated with Enogen. Regardless of whether the white corn contained Enogen, the white

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

corn did not perform properly when steeped in lime water (nixtamalization), ground and processed. Documents and testimony of Honeyville executives show: (A) After being nixtamalized, ground and processed, the white corn was used to make masa for tamales; tamales made from the corn would not cook properly; they did not form up; regardless of how long they were cooked up, ruining the tamale meals; (B) After the incident Gavilon's white corn was tested and found to be contaminated with Enogen; (C) Experts, including Honeyville's experts Dr. Wayne Moore, Ph.D., and Dr. Joseph Awika, Ph.D., and La Amapola's expert Dr. Murray, analyzed the corn and concluded that defects in the white corn (either Enogen, in the case of Dr. Moore and Dr. Awika; or poorly formed starch, Dr. Murray), caused the tamale problem; (E) Honeyville's representatives will testify that Honeyville's handling of the white corn did not change or alter the characteristics of the corn; (F) executives of Gavilon, La Amapola, and/or Honeyville will testify that something about the white corn must have caused the tamale problem due to the following;(G) The timing of the tamale problems: they began and ended with Gavilon's corn; (H) The nature of the problems: starch failure in corn; (I) the undisputed fact that Enogen is designed to degrade corn starch; (J) testing demonstrates that Gavilon's corn was actually contaminated by Enogen; (K) Gavilon had concerns about Enogen contaminating its corn, prior to this incident; (L) Gavilon

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

experienced similar problems experienced with other customers; (M) Gavilon admitted to a different customer that it thought Enogen was causing similar problems; (N) Gavilon's own expert cannot rule out Enogen as the cause of the problems; (O) executives of La Amapola will testify that La Amapola's tamale problems continue after it stopped buying corn from Honeyville; (O) La Amapola's replacement white corn supplier The Grayn Co. was La Amapola white corn sourced from Gavilon; and (P) there is no evidence that Honeyville caused La Amapola's problems.

iv.   Honeyville was harmed.  (A) Honeyville representatives will testify that La Amapola and at least five other customers quit purchasing white corn from Honeyville immediately after the incident.  (B)  Honeyville's executives and its forensic expert will testify that the resulting damages exceed $1.6 million.

v.   The failure of the white corn to conform to the warranty was a substantial factor in causing Honeyville's harm: (A) see evidence summarized at (ii) above; (B) Honeyville had long-term relationships with most of its customers, including La Amapola. (C) Due to the incident these customers stopped buying white corn from Honeyville. (D) Honeyville's executives and its forensic expert will testify that the resulting damages exceed $1.6 million.

## III.   IDENTIFICATION OF ANY ANTICIPATED EVIDENTIARY ISSUES

### A.   <u>Admissibility of Expert Witness Testimony (*Daubert* Motions)</u>

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

The court has already denied Gavilon's Motion for Summary Judgment and Motion to Exclude Expert Testimony (Docket #64) based on an assertion that the expert testimony did not satisfy *Daubert*.   (Docket # 85) Consequently, *Daubert* should not be an issue at trial with respect to these scientific experts.

Honeyville does not currently intend to bring any Daubert motions against the experts designated by La Amapola and Gavilon

## B.   Stipulations re Foundation and Authenticity

The parties have endeavored to stipulate to the authenticity of all documents list as exhibits or produced in the lawsuit and labeled with bates numbers.  The remaining documents and exhibits at issue as to foundation and authenticity are listed in the Joint Exhibit List.

## C.   Motions in Limine re Evidentiary Matters

Honeyville filed the following motions in limine regarding evidentiary matters:

Motion in Limine No. 1: For an Order Excluding Evidence of Unrelated Management Changes at Honeyville. [FRE 401-403.]

Motion in Limine No. 2: For an Order Excluding Evidence of Unrelated Complaint Incidents (Including Claims of Alleged Dirty/Broken/Small-Kernel Corn). [FRE 401-403.]

Motion in Limine No. 3: For an Order Excluding Page 2 of the Howdeshell Expert Report of La Amapola, Inc.

## D.   Other Evidentiary Matters

### 1.   Gavilon Color Sorter Testimony

Honeyville expects that Gavilon may attempt to introduce testimony at trial regarding use of a color sorter to remove Enogen corn.  Honeyville expects to object to this testimony on various grounds, including lack of foundation, speculation, and improper lay opinion testimony, probative value outweighed by substantial prejudice, and the lack of relevance to any defense. Depending on the amount and extent of the testimony Gavilon intends to introduce, it may helpful to have an advance ruling on

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

these issues.

2.    <u>Order and Manner of Proof of Honeyville Attorney Fees for Defense of La Amapola claim.</u>

Honeyville seeks recovery from Gavilon for all damages relating to any judgment in favor of La Amapola and against Honeyville. This would include attorney's fees and costs and expenses incurred by Honeyville in defending against the La Amapola complaint. The amount of these fees will increase through trial. There will be an issue as to whether and how to allocate Honeyville's fees between the defense of La Amapola and the Third Party Claim against Gavilon. Honeyville suggests that the court (and not the jury) resolve this aspect of attorney's fees after the jury has decided the main issues, assuming the jury finds Honeyville is entitled to recover damages from Gavilon relating to the La Amapola's judgment. Alternatively that jury decide could this matter in a bifurcated proceeding. Honeyville has not designated exhibits or witnesses on this aspect of its claim and reserves the right to do so. Honeyville will designate those exhibits before the commencement of the main trial if requested by the Court.

3.    <u>Gavilon's "Terms and Conditions" Sheet—Not To Be Referenced At Trial</u>

This Court previously issued an Order denying Gavilon's Motion to Dismiss/Compel Arbitration (Docket No. 44) which had been based on an alleged "terms and conditions" page that Honeyville contended was not part of the parties' agreement. After discussion between counsel, it is Honeyville's understanding that Gavilon will not be introducing or referring to the n "terms and conditions." Accordingly, Honeyville did not bring a motion in limine on this issue.

4.    <u>Request for Judicial Notice.</u>

Honeyville requests that the Court take for judicial notice of various items, including but not limited to the following:

a.    The definition of "negative" as given in the Concise Oxford

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

American Dictionary (2006 ed.), page 592, Definition 1: "consisting in or characterized by the absence rather than the presence of something"; example-- "(of the results of a test or experiment) indicating that a certain substance is not present or a certain substance does not exist;" *inf.* "denoting a complete lack of something" and page 593, Definition 3: "the result of a test or experiment indicating that a certain substance is not present or a certain condition does not exist."

   b. The definition of "negative" as given in the Webster's New Collegiate Dictionary (1977 ed.), at page 768, Definition 1b(2): "denoting the absence or the contradictory of something."

   c. The results of a search of the public website operated by Syngenta indicating authorized Enogen dealers in the relevant areas of Grand Island, Nebraska, and Hereford, Texas. (https://www.syngenta-us.com/rep-finder?crop=enogen)

   5. <u>Need for Documents Under Seal</u>

There are a few confidential documents that may require use under seal, primarily sensitive financial documents. Honeyville proposes that the parties meet and confer to prepare a stipulation covering those documents which they agree should be filed under seal, and a list of any disputed documents that will require a ruling by the Court.

**E. IDENTIFICATION OF ANY ISSUES OF LAW**

   1. <u>Jurisdiction</u>

This is a diversity action, removed to Federal Court. Gavilon has admitted diversity jurisdiction exists. In general, the substantive laws of the state of California govern diversity proceedings. (*Erie R. R. Co. v. Tompkins* (1938) 304 U.S. 64, 78.)

   2. <u>Gavilon Affirmative Defenses—Inapplicable As A Matter of Law</u>

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

Many of the affirmative defenses asserted by Gavilon to Honeyville's claims should not proceed to trial.

Some appear to be "reserved" to preserve objections, but Gavilon does not intend to pursue them or is barred from doing so. (For example, "Failure to State a Claim Upon Which Relief May Be Granted.")

Some appear to be back-door attempts to apply inapplicable tort-type defenses to contract claims.   ("Appropriate Care"; "Misuse of Product;" "Superseding, Intervening Cause")  These are legally inapplicable. Contributory negligence is not a defense to breach of warranty claims.  (*See, e.g., Shaffier v. Debbas* (1993) 17 Cal.App.4th 33, 42; *Crane v. Sears Roebuck & Co.* (1963) 218 Cal.App.2d 855, 860; *citations* at 50A Cal. Jur. 3d Products Liability § 95.)

Others purported defenses are inapplicable to breach of warranty claims.  (E.g., Non-reliance.)  (*See, e.g.* Ca. U. Comm. Code §2313(1) (Express Warranties), Official California Comment 2: no particular reliance need be shown).

For still others, it should be admitted that there are no facts whatsoever supporting the affirmative defenses. These should be dropped now, and if not now, Honeyville will bring motion for a nonsuit or directed verdict at the appropriate time. (E.g., Disclaimers, Failure to Notify; Ratification, Acquiesce, Consent; Limitation of Remedies; Waiver, Estoppel, Laches; Mistake; Unclean Hands).

## IV.   BIFURCATION OF ISSUES

Honeyville does not currently request bifurcation of issues, except with respect to recovery of its attorneys' fees, costs and expenses in defending against the La Amapola complaint, as discussed above.

## V.   JURY TRIAL

Honeyville will stipulate to a bench trial.

## VI.   ATTORNEYS' FEES

Honeyville's Third Party Complaint seeks an award against Gavilon of its attorneys' fees incurred this action.   Honeyville's attorneys fees (incurred both

31

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

defending against La Amapola's claim and bringing its claim for implied contractual indemnity against Gavilon) are consequential damages recoverable under Honeyville's claim for implied contractual indemnity.   Section 1021.6 of the Code of Civil Procedure authorizes an award of attorney's fees to a party who prevails on a claim for implied indemnity when: (a) due to the indemnitor's actions, the indemnitee has been required to act in the protection of its interest by bringing an action against or defending an action by a third person; (b) the indemnitor was properly notified of the demand to bring the action or provide the defense and did not avail itself of the opportunity to do so; and (c) the trier of fact determines that the indemnitee was without fault in the principal case which is the basis for the action in indemnity.  (See Code Civ. Procedure §1021.6; *see also Uniroyal Chemical Co., Inc. v. American Vanguard Corp.* (1988) 203 Cal.App.3d 285, 291–297.)

La Amapola does not allege entitlement to attorneys' fees in its claim against Honeyville, and has no entitlement to attorneys' fees. Even if La Amapola were entitled to attorney's fees against Honeyville (and it is not), such fees would be an element of Honeyville's damages claim against Gavilon, and would be fully recoverable by Honeyville from Gavilon.  "Indemnity may be defined as the obligation resting on one party to make good a loss or damage another party has incurred." (*See Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628.)

## VII.   ABANDONMENT OF ISSUES

Honeyville abandons the following affirmative defenses asserted in Honeyville's Answer (Docket No. 9) to La Amapola's Complaint: waiver, laches, estoppel, failure to mitigate, offset for unpaid invoice, disclaimer.  Honeyville does not abandon its assertion that La Amapola's evidences does not support the amount of damages claimed.

Honeyville and La Amapola have agreed to a dismissal of Honeyville's counterclaim (Docket No. 8) against La Amapola to be handled by separate stipulation and order,

ROBINSON & ROBINSON, LLP
SERVING JUSTICE • RRLAWYERS.COM

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

## VIII.  CONCLUSION

Honeyville reserves the right to modify, amend, and supplement this Memorandum of Contentions of Law and Fact.

Dated: September 14, 2018                 ROBINSON & ROBINSON LLP

By:   /s/ Jeffrey A. Robinson
                                                  Jeffrey A. Robinson, Esq.
                                                  Attorneys for Defendant, Counter-Claimant
                                                  and Third-Party Plaintff Honeyville, Inc.

**HONEYVILLE'S**
**MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

1

2

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed in the county of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is **2301 Dupont Drive, Suite 530, Irvine, CA 92612.**

On September 14, 2018, I served the documents described as **HONEYVILLE, INC.'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

on interested parties in this action, listed below as follows:

See Attached Proof of Service

**[x]**  I caused the above documents to be submitted to the Court for filing and electronic service through the CM/ECF System in accordance with Local Rule 5-3.3 and General Orders 08-02.

**[X] (FEDERAL)** I certify and declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on September 14, 2018

/s/ *Charles Patterson*
Charles Patterson

**HONEYVILLE'S
MEMORANDUM OF CONTENTIONS OF LAW AND FACT**

La Amapola, Inc. v. Honeyville, Inc., et al.
Case No.  2:17-cv-01946 AB (ASx)

Service List

Matthew L Kinley
Kinley Law Practice
300 E. 4th Street, #103
Long Beach, CA 90802
Tel: (562) 715-5557 / Fx: (562) 318-3056
*Attorneys for Plaintiff and*
*Counter-Defendant*
*La Amapola, Inc.*

Aaron S. Case, Esq.
YOKA & SMITH, LLP
445 S. Figueroa Street, 38th Floor
Los Angeles, CA  90071
Tel.: (213) 427-2300 / Fx: (213) 427-2330
*Attorneys for Third Party Defendant*
*Gavilon Grain, LLC*

Patrick E. Brookhouser, Jr., Esq.
McGrath North Mullin and Kratz PC LLO
1601 Dodge Street Suite 3700
Omaha, NE 68102
Tel: (402) 633-9548 / (402) 341-0216
*Attorneys for Third Party Defendant*
*Gavilon Grain, LLC*

35

**REPLY AND OBJECTION OF HONEYVILLE TO LA AMAPOLA'S**
**OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT**